**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | |
|---|---|
| MAXELL, LTD., | |
| *Plaintiff*, | |
| v. | |
| TCL Electronics Holdings Ltd. (f/k/a TCL Multimedia Technology Holdings, Ltd.); TCL Industries Holdings Co., Ltd.; T.C.L. Industries Holdings (H.K.) Limited; TTE Corporation; TCL Moka International Limited; TCL Moka Manufacturing S.A. de C.V.; TCL King Electrical Appliances (Huizhou) Co., Ltd.; Manufacturas Avanzadas S.A. de C.V.; TCL Smart Device (Vietnam) Co., Ltd.; Shenzhen TCL New Technology Co., Ltd.; TCL Optoelectronics Technology (Huizhou) Co., Ltd.; TCL Overseas Marketing Ltd.; and TCL Technology Group Corporation (f/k/a TCL Corp.), | Civil Action No. [                    ]  <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Maxell, Ltd. ("Maxell"), by and through its undersigned counsel, files this complaint under 35 U.S.C. § 271 for Patent Infringement against Defendants TCL Electronics Holdings Ltd. (f/k/a TCL Multimedia Technology Holdings, Ltd.); TCL Industries Holdings Co., Ltd.; T.C.L. Industries Holdings (H.K.) Limited; TTE Corporation; TCL Moka International Limited; TCL Moka Manufacturing S.A. de C.V.; TCL King Electrical Appliances (Huizhou) Co. Ltd.; Manufacturas Avanzadas S.A. de C.V.; TCL Smart Device (Vietnam) Co., Ltd.; Shenzhen TCL New Technology Co., Ltd.; TCL Optoelectronics Technology (Huizhou) Co., Ltd.; TCL Overseas Marketing Ltd.; and TCL Technology Group Corporation (f/k/a TCL Corp.) (all

collectively, "TCL" or "Defendants") and further alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

## <u>OVERVIEW</u>

1.      This is an action for patent infringement by Maxell. Founded in 1961 as Maxell Electric Industrial Co., Ltd., Maxell is a leading global manufacturer of information storage media products, including magnetic tapes, optical discs, and battery products such as lithium ion rechargeable micro batteries and alkaline dry batteries, and the company has over 50 years of experience producing industry-leading recordable media and energy products for both the consumer and the professional markets. Maxell is also a leading manufacturer of projectors and lenses and additionally sells various other devices, such as Bluetooth headsets, wireless charging solutions, etc.

2.      Maxell has built up an international reputation for excellence and reliability, for pioneering the power supplies and digital recordings for today's mobile and multi-media devices, and leading the electronics industry in the fields of storage media and batteries.

3.      Since being one of the first companies to develop alkaline batteries and Blu Ray camcorder discs, Maxell has always assured its customers of industry-leading product innovation and is one of the world's foremost suppliers of memory, power, audio, and video goods. Maxell's well-recognized logo and iconic "blown away" image exemplify the reputation Maxell carefully developed in these markets.



4.      As more fully described below, in 2009 Hitachi, Ltd. assigned much of its consumer product-facing intellectual property to its consumer product business division, Hitachi Consumer Electronics Co., Ltd. Then, in 2013, the consumer electronics division of Hitachi Consumer Electronics Co., Ltd., was transferred to Hitachi Maxell, Ltd. This involved assigning the intellectual property including the patents in this case, to Hitachi Maxell, Ltd. In 2017, Hitachi Maxell engaged in a reorganization and name change—to Maxell, Ltd.—in an effort to align its intellectual property with the business development, research and development, and licensing efforts of Maxell, including in the mobile and mobile-media device market (Hitachi, Ltd. and Hitachi Consumer Electronics Co., Ltd. are referred to herein collectively as "Hitachi"). In October 2021, Maxell Holdings, Ltd. and Maxell, Ltd. underwent an absorption-type merger and name change. In that merger, Maxell, Ltd. was absorbed by Maxell Holdings, Ltd., including the ownership of the patents at issue in this matter and the rights to license agreements covering such patents. Maxell Holdings, Ltd. then changed its name to Maxell, Ltd. Maxell continues to own all rights to the patents-in-suit, as well as the entire Maxell portfolio initially obtained from Hitachi.

5.      Today, Maxell maintains a thriving business in the mobile device market including wireless charging solutions, wireless flash drives, multimedia players, storage devices, and headphones. Maxell also maintains intellectual property related to televisions, computer products, tablets, digital cameras, and mobile phones. As a technology developer and industry leader, and due to its historical and continuous investment in research and development, including in the State of Texas, Maxell owns a portfolio of patents related to such technologies and actively enforces its patents through licensing and/or litigation. Leading television manufacturers have recognized the value of Maxell's intellectual property and have obtained a license from Maxell in the recent past—including many of the television companies well-known to consumers.

6.      Maxell is forced to bring this action against TCL as a result of TCL's knowing and ongoing infringement of Maxell's patents as further described herein.

## TCL's Knowledge of Maxell's Patent Portfolio

7.      TCL has been aware of Maxell's patents since at least November 8, 2019, when Maxell's Senior Manager, Norio Kitagata, sent a notice letter to TCL Corporation outlining Maxell's ownership of a substantial portfolio of patents related to television technologies. This letter specifically identified a list of thirty-three U.S. patents and referenced TCL's 8-Series, 6-Series, 5-Series, 4-Series, 3-Series, and S-Series smart televisions as potentially practicing these patents., which included U.S. Patent No. 8,107,007.

8.      After receiving the notice letter, on December 24, 2019, TCL requested claim charts. On May 21, 2020, TCL was sent four claim charts. The parties engaged in patent licensing negotiations related to Maxell's TV products, during which they discussed a worldwide licensing program, but TCL indicated it would analyze the claim charts first and engage in technical discussions, with commercial discussions to follow.

9.      On August 20, 2020, Maxell followed up with a proposed term sheet for a patent license agreement and an updated list of its TV patents, which included U.S. Patent No. 8,107,007.

10.     Maxell followed up on these initial conversations with a letter to TCL on January 18, 2021. After subsequent correspondence, TCL answered with a proposed call around March but asked for an extension due to supplier technical analysis.

11.     Maxell requested a written explanation of the outcome of TCL's internal discussion and clarified that Maxell was discussing licensing with TCL, not with the supplier. There was no response from TCL. Maxell followed up a month later, and the parties subsequently agreed on a call.

12.     On April 30, 2021, the parties held a teleconference to discuss patent license negotiations. During this call, Maxell requested TCL to provide sales data. On May 1, 2021, Maxell provided TCL with a list of licensees for Maxell's TV patent portfolio.

13.     On May 17, 2021, TCL shared an invalidity report. On July 20, 2021, Maxell disagreed and sent a follow-up notice letter. This letter included U.S. Patent No. 7,730,507.

14.     Almost a year later, on May 13, 2022, TCL replied to the notice letter with a technical analysis of Maxell's patents by outside counsel.

15.     On June 21, 2022, Maxell disagreed with the analysis, and suggested a meeting to start a business discussion to determine the terms of the license agreement instead of discussing technical details, but TCL insisted on continuing the technical discussions.

16.     On August 8, 2022, the parties agreed to extend their Non-Disclosure Agreement ("NDA"), with the new term running through March 31, 2023. At this time, Maxell again requested that TCL provide its sales data.

17.     On August 29, 2022, TCL countersigned the NDA and suggested a conference call.

18.    On September 9, 2022, TCL agreed that the arranged conference would be business-side oriented, and the conference was scheduled for September 22, 2022.

19.    In subsequent communications, Maxell explained they could not share specific license agreements due to confidentiality limitations and had found the current NDA unworkable. Instead, Maxell proposed providing TCL with anonymized summary information about the licenses after a standard NDA was signed. Maxell reiterated they would not provide further claim charts and awaited TCL's response. On August 21, 2023, after a few revisions, the parties signed the new NDA.

20.    On September 6, 2023, Maxell provided TCL with anonymized summary information about the licenses along with a new term sheet. Maxell again requested for the sales information they had been requesting for over two years, and asked TCL for a counteroffer in a timely manner.

21.    Maxell had hoped that the parties could reach a mutually beneficial solution—but TCL instead implemented dilatory tactics for years and elected not to enter into an agreement with Maxell and/or license Maxell's patents for its televisions. Accordingly, on October 2023, Maxell filed  a Complaint for patent infringement in this Court (5:23-cv-00108-RWS-JBB) asserting six patents—U.S. Patent Nos. 7,924,366, 10,650,780, 10,375,341, 10,015,558, 10,219,020 and 10,321,206. On August 21, 2024, Maxell also filed a Complaint with the ITC (337-TA-1420) asserting U.S. Patent Nos. 8,549,109, 11,451,860, 11,924,502, and 10,958,971.

22.    On January 17, 2025, Maxell sent an updated follow-up notice letter including U.S. Patent No. 8,107,007, U.S. Patent No. 7,730,507, U.S. Patent No. 8,970,793, U.S. Patent No. 10,459,270, and U.S. Patent No. 9,746,710.

23.     TCL continues to make, use, sell, and offer for sale Maxell's patented technology without a license. Accordingly, Maxell now files this Complaint.

## PARTIES

24.     Plaintiff Maxell, Ltd. is a Japanese corporation with a registered place of business at 1 Koizumi, Oyamazaki, Oyamazaki-cho, Otokuni-gun, Kyoto, Japan.

25.     Upon information and belief, TCL Electronics Holdings Ltd. (f/k/a TCL Multimedia Technology Holdings, Ltd.) ("TCL Electronics") is a limited liability company duly organized and existing under the laws of the Cayman Islands, having an address of 7th Floor, Building 22E, 22 Science Park East Avenue, Hong Kong Science Park, Shatin, New Territories, Hong Kong. TCL Electronics may also be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of that business.

26.     TCL Electronics is an indirect wholly-owned subsidiary of TCL Technology Group Corporation. TCL Electronics is involved in the manufacture and sales of TVs, smart mobile phones, smart connective devices and services, smart commercial display and smart home products and provision of Internet platform operating services.[1] This action arises out of that business.

27.     Upon information and belief, Defendant TCL Industries Holdings Co., Ltd. is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business at 22nd Floor, TCL Technical Tower, Huifeng 3 Road, Zhongkai Development Zone Huizhou, China. This action arises out of that business.

28.     Upon information and belief, Defendant T.C.L. Industries Holdings (H.K.) Limited

---

[1] *See generally* TCL Electronics Holdings Limited Annual Report 2024.
(https://doc.irasia.com/listco/hk/tclelectronics/annual/2024/ar2024.pdf)

is a corporation organized and existing under the laws of Hong Kong with its principal place of business at 8th Floor, Building 22E, Phase Three, Hong Kong Science Park, Pak Shek Kok, New Territories, Hong Kong. This action arises out of that business.

29.    Upon information and belief, Defendant TTE Corporation is a corporation organized and existing under the law of the British Virgin Islands with its principal place of business at 7th Floor, Building 22E, 22 Science Park East Avenue, Hong Kong Science Park, Shatin, New Territories, Hong Kong. This action arises out of that business.

30.    Upon information and belief, Defendant TCL Moka International Limited is a Hong Kong corporation with a principal place of business at 7th Floor Hong Kong Science Park, Building 22 E, 22 Science Park East Avenue, Shatin, New Territories, Hong Kong or 13th Floor, TCL Tower, 8 Tai Chung Road, Tsuen Wan, New Territories, Hong Kong. This action arises out of that business.

31.    Upon information and belief, Defendant TCL Moka Manufacturing S.A. de C.V. is a company organized under the laws of Mexico with a principal place of business at Calle Cuarta. No. 55, Ciudad Industrial Nueva Tijuana, Tijuana, BJ 66050, Mexico. This action arises out of that business.

32.    Upon information and belief, Defendant TCL King Electrical Appliances (Huizhou) Co. Ltd. is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business at No. 78, Huifeng 4 Road, Zhongkai Development Zone Huizhou, 516006 P.R. China. This action arises out of that business.

33.    Upon information and belief, Defendant Manufacturas Avanzadas S.A. de C.V. is a corporation organized and existing under the law of Mexico with a principal place of business at

Blvd. Independecia No. 2151, Ciudad Juarez, Chihuahua, 32580, Mexico. This action arises out of that business.

34.    Upon information and belief, Defendant TCL Smart Device (Vietnam) Co., Ltd. is a corporation organized and existing under the laws of Vietnam with its principal place of business at No. 26 VSIP II-A, Street 32, Vietnam Singapore Industrial Park II-A, Tan Binh Commune, Bac Tan Uyen District, Binh Duong Province, 75000, Vietnam. This action arises out of that business.

35.    Upon information and belief, Defendant Shenzhen TCL New Technology Co., Ltd. is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business at 9th Floor, TCL Electronics Holdings Limited Building, TCL International E City, No. 1001 Zhongshan Park Road, Nanshan, China. This action arises out of that business.

36.    Upon information and belief, Defendant TCL Optoelectronics Technology (Huizhou) Co., Ltd. is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business at Ltd. No. 78 Huifeng Si Rd, Zhongkai High-New Development Zone, Huizhou, Guangdong, 516006, China. This action arises out of that business.

37.    Upon information and belief, Defendant TCL Overseas Marketing Ltd. is a corporation organized and existing under the laws of the British Virgin Islands with its principal place of business at 5th Floor, Building 22E, 22 Science Park East Avenue, Hong Kong Science Park, Shatin, New Territories, Hong Kong. This action arises out of that business.

38.    Upon information and belief, TCL Technology Group Corporation ("TCL Technology") is a company duly organized and existing under the laws of China, with its principal of business located at No 26, the Third Road, Zhongkai Avenue, Huizhou City, Guangdong, China 516006, and may be served pursuant to the provisions of the Hague Convention. TCL Technology

may also be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of that business.

39.    TCL Technology—together with its subsidiaries—describes itself as "world-leading consumer electronics company that covers display, innovative, and internet businesses." *See supra* note 1, at 5.

40.    Upon information and belief, Defendant TCL Industries Holdings Co., Ltd is the ultimate parent company of all of the other named defendants, and as the ultimate parent, induces its subsidiaries, affiliates, retail partners, and customers in the making, using, selling, offering for sale, and/or importing of products accused of infringement in this Complaint through its subsidiaries.

41.    Upon information and belief, Defendants are part of the same corporate structure and distribution chain for making, using, selling, offering for sale, and/or importing the accused televisions in the United States, including in this State and this District. Defendants do business as a collective whole under the TCL brand.

42.    Upon information and belief, Defendants ("TCL") are part of an interrelated group of companies which together comprise one of the largest makers and sellers of televisions in the United States, including the TCL brands. TCL, which refers to the company and its subsidiaries as the "Group," describes itself as one of the "world's leading consumer electronics company" and states that the Group "strives to consolidate the 'Intelligent IoT Ecosystem' strategy and is committed to providing users with an all-scenario smart and healthy life while developing into a world-leading smart device company.'" *See supra* note 1, at 5. It further states that the Group is

"mainly involved in the manufacture and sale of television ('TV') sets, smartphones, smart connective devices, smart commercial display and smart home products, all-category marketing, photovoltaic business and the provision of internet platform operating services." *Id*. at 144.

43.     Defendants and their affiliates are part of the same corporate structure and distribution chain for the making, importing, offering to sell, selling, and using of the accused devices in the United States, including in the State of Texas generally and this judicial district in particular.

44.     Defendants and their affiliates are part of the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and accused product lines and products involving related technologies.

45.     Thus, Defendants and their affiliates operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein.

46.     The parties to this action are properly joined under 35 U.S.C. § 299 because of the right to relief asserted against defendants jointly and severally arises out of the same series and transactions or occurrences relating to the making and using of the same products or processes. Additionally, questions of fact common to all defendants will arise in this action.

## NATURE OF THE ACTION, JURISDICTION, AND VENUE

47.     Maxell brings this action for patent infringement under the patent laws of the United States, 35 U.S.C. § 271 *et seq*.

48.     This Court has subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the patent laws of the United States.

49.     This Court has personal jurisdiction over Defendants pursuant to due process and/or the Texas Long Arm Statute because (1) Defendants conduct business and continue to do business

in Texas, (2) Defendants have committed acts of direct and indirect patent infringement in this District, the State of Texas, and elsewhere in the United States, including making, using, offering to sell, and/or selling accused products in Texas, and/or importing accused products into Texas, including by Internet sales and sales via retail and wholesale stores, inducing others to commit acts of patent infringement in Texas, and/or committing at least a portion of any other infringements alleged herein. In addition, or in the alternative, this Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(2).

50.    This Court previously found that a number of the Defendants are subject to personal jurisdiction in this forum. *See Canon, Inc. v. TCL Elecs. Holdings Ltd.,* No. 2:18-CV-00546-JRG, 2020 WL 1478356, at *3 (E.D. Tex. Mar. 25, 2020).

51.    Personal jurisdiction also exists specifically over each of the Defendants because they have overlapping executives, interlocking corporate structures, and close relationships as manufacturer, importer, and distributor of accused products.

52.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b) because (1) Defendants have done and continue to do business in this district; (2) Defendants have committed and continue to commit acts of patent infringement in this district, including making, using, offering to sell, and/or selling accused products in this district, and/or importing accused products into this district, including by internet sales and sales via retail and wholesale stores, and/or inducing others to commit acts of patent infringement in this district; and (3) Defendants are foreign entities.

53.    Venue is also proper as to foreign Defendants, each of which is organized under the laws of a foreign jurisdiction. 28 U.S.C. § 1391(c)(3) provides that "a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall

be disregarded in determining where the action may be brought with respect to other defendants." *See also In re HTC Corp.,* 889 F.3d 1349 (Fed. Cir. 2018).

54.     Additionally, Maxell has had regular and continuous business in Texas since 2014. As a result of such business dealings and hopes to expand those and other business dealings, a Maxell affiliate, Maxell Research and Development America, LLC ("MRDA"), was founded in Marshall, Texas. MRDA is part of a joint venture with another business in Marshall, and the entities work together on research and development related to IoT, mobile, media and battery technologies. MRDA's ongoing projects include, for example, the research and development of lensless camera technology, which Maxell hopes will be utilized for sensor and camera technology in smartphones. Maxell has regularly met and continues to regularly meet with MRDA to expand its business, and investments are being made by Maxell, MRDA, and others in this District to further the goals of these companies.

55.     Maxell has filed other lawsuits in Texas including one to enforce the patent portfolio of which the currently asserted patents are a part against Hisense Co., Ltd. et al and TCL.

## COUNT 1 - INFRINGEMENT OF U.S. PATENT NO. 8,107,007

56.     Maxell incorporates paragraphs 1-55 above by reference.

57.     U.S. Patent No. 8,107,007 (the "'007 Patent," attached hereto at Exhibit 1) duly issued on January 31, 2012 and is entitled *Image Processing Apparatus.*

58.     Maxell is the owner of the '007 Patent and possesses all rights under the '007 Patent, including the exclusive right to recover for past and future infringement.

59.     The '007 Patent is directed to an image processing apparatus, such as a television, designed to intelligently adjust the frame rate of video content being displayed. This apparatus fundamentally includes an input unit for an image signal with a predetermined frame rate, an information acquirer for obtaining specific details about that input signal (like the amount of

motion or the genre of the program), and a frame rate converter. The primary role of this converter is to modify the frame rate of the input image signal dynamically, based on the information gathered by the acquirer, before outputting the signal for display.

60.     The development of such an apparatus builds on a long-standing understanding within image science. It has been understood for over a century, from early motion studies, that creating more frames to capture a given motion will result in a smoother visual presentation. The "frame rate" itself simply refers to the number of individual frames displayed per unit of time; for instance, a frame rate of 60 hertz (Hz) means that 60 individual frames are shown every second. The '007 Patent focuses on optimizing this aspect of video display for various content types.

61.     The '007 Patent explains that conventional methods of frame rate up-conversion, while capable of making moving pictures appear smoother, are not without significant drawbacks. A key issue is that such continuous up-conversion "is not effective in a scene having few motions such as a still picture." '007 Patent at 2:28-30. When these older techniques are "conducted regardless of the image state"—that is, without considering whether the image is a dynamic action scene or a static picture—it leads to a situation where "the amount of signal processing that is not effective increases." *Id*. at 2:32-35. This unnecessary processing not only fails to enhance the viewing experience for low-motion content but also results in increased "power consumption of the apparatus." *Id*. at 2:38-40.

62.     The '007 Patent solved these problems by providing "a technique capable of converting the frame rate efficiently." *Id*. at 2:41-42. The innovation lies in the adaptive approach: "In accordance with the present invention, frame rate conversion processing is conducted on an input image signal having a predetermined frame rate on the basis of information concerning the input image signal." *Id*. at 2:43-46. This allows the frame rate to be "changed flexibly according

14

to the image kind (such as the scene or motion amount)," which in turn facilitates efficient conversion processing and helps to save power. *Id*. at 2:59-61. The '007 Patent does not claim to have invented a new method for the physical act of changing frame rates; instead, it discloses that its "frame rate converter" employs established, conventional techniques, such as "interpolation" methods (which generate new frames based on adjacent existing frames), to achieve the desired frame rate adjustment. *Id*. at 1:16–22, 4:10–31.

63.     Defendant has directly infringed one or more claims of the '007 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 2, 4, 5, 8, 9, and 10 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example, products known as the TCL 50S555 television.

64.     The TCL 50S555 is a television with options to accept predetermined frame rate image signals from a variety of sources such as streaming services, game consoles, Blu-ray players, or cable/satellite boxes, through an HDMI, Composite, USB, Ethernet or RF ports (Antenna/Cable).



65.    The TCL 50S555 has an AiPQ Engine (processor) that acquires information about the input image signal during a specific picture mode or when "Action Smoothing" feature is enabled. Further, on information and belief, the AiPQ Engine (processor) has a frame rate converter for converting the frame rate of the input image signal by processing the input image signal and adjusting the frame rate of the output signal based on the content type.





*Action smoothing* – *Only on select models:* Adjusts the amount of action smoothing applied to the video signal. A higher setting results in more smoothing, but can cause undesirable picture artifacts in certain types of content. *Each **Picture mode** has a different **Action smoothing** default setting.*

# How do Action Smoothing, Action Clarity, and LED Motion Clarity work?

Motion blur is the result of object or camera motion and impacted by the frame rate. This becomes more noticeable with greater motion and more camera panning.

Action Smoothing, Action Clarity, and LED Motion Clarity work by adjusting your TV.

- **Action Smoothing** adjusts the amount of motion processing applied to the video.
- **Action Clarity** improves the perceived sharpness of the picture.
- **LED Action Clarity** inserts black frames between picture frames to reduce the perceived motion blur.

## More about Action Smoothing

Action Smoothing settings are unique and persistent for every input, and for each type of content (e.g., 1080p, 4K, 4K HDR). For example, if you have a 4K Blu-ray™ player connected to HDMI 1, you can assign a different Action Smoothing setting for 1080p movies, 4K movies, and 4K HDR movies. Each time you return to HDMI 1 to watch a movie, the Action Smoothing setting automatically returns to the assigned value depending on the type of content being watched.



66.     In addition, on information and belief, AiPQ Engine (processor) detects a motion amount in the input image signal. For example, the TCL 50S555 utilizes its "picture mode" functionality to engage the AiPQ Engine's analysis capabilities. Specifically, features like the "Auto" setting (or Roku Smart Picture) leverage this engine analysis to adjust the frame rate depending on the detected content type. This allows the system to generate a higher or more suitable frame rate for the input image signal, considering the motion amount as identified by the processor.

- **Picture mode** – Provides picture presets for various viewing preferences. *This setting applies to the currently-selected input only.*

# What are the different picture modes?

Learn about the different pictures modes available on your TV in the sections below.

## What picture modes are available?

You can choose from the following picture modes on all Roku TV models.

- **Auto (recommended):** Automatically adjust your TV settings for what you're watching
- **Low Power**: Optimized to save energy. This is the default "out of box" setting
- **Standard**: Good for everyday viewing in moderate to bright rooms.
- **Vivid**: Intense and brilliant picture for use in rooms with a lot of light
- **Sports**: Optimized for sports viewing where camera panning, and action shots are common
- **Movie**: Ideal for darker rooms to view the movie as the director intended



67.     Further, on information and belief, the frame rate converter in the TCL 50S555 converts the frame rate of an image signal corresponding to the program on the basis of genre information. For example, the AiPQ Engine (processor) conducts a frame rate conversion of the input image signal corresponding to the program on the basis of genre information using the "Movie mode" of the picture mode functionality.



68.     The foregoing features and capabilities of the TCL 50S555, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendant's direct infringement by satisfying every element of at least claims 1, 2, 4, 5, 8, 9 and 10 of the '007 Patent, under 35 U.S.C. § 271(a).

69.     On information and belief, Defendant further infringes the '007 Patent through additional products (collectively, "the '007 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the TCL 50S555 television. The '007 Accused Products include, by way of examples, TCL's 5-Series televisions including at least the 55S531, 65S531, 50S535, 55S535, 65S535, 75S535, 50S546, 55S546, 65S546, 75S546, 50S555, 55S555, 65S555, 75S555, 55T551, 65T551, 65T554, 50T555, 55T555, 65T555, and 75T555; 6-Series televisions including at least the 55R635, 65R635, 75R635, 55R646, 65R646, 75R646, 65R648, 75R648, 55R655, 65R655, 75R655, 85R655; S-Class televisions including at least the

40S35F, 32S350F, 40S350F, 43S450F, 50S450F, 55S450F, 65S450F, 75S450F, 50S45G, 32S250G, 32S330G, 40S330G, 43S330G, 32S350G, 40S350G, 43S350G, 32S370G, 40S370G, 43S370G, 43S450G, 50S450G, 55S450G, 58S450G, 65S450G, 75S450G, 85S450G, 43S470G, 50S470G, 55S470G, 58S470G, 65S470G, 70S470G, 75S470G, 85S470G, 98S550G, 32S210R, 32S250R, 32S310R, 40S310R, 43S310R, 32S350R, 40S350R, 43S350R, 43S450R, 50S450R, 55S450R, 58S450R, 65S450R, 75S450R, 85S450R, 43S551F, 50S551F, 55S551F, 65S551F, 75S551F, 43S551G, 50S551G, 55S551G, 65S551G, 75S551G, 85S551G; Q-Class televisions including at least the 43Q570F, 55Q650F, 65Q650F, 75Q650F, 55Q651F, 65Q651F, 75Q651F, 50Q550G, 55Q550G, 65Q550G, 75Q570G, 55Q650G, 65Q650G, 75Q650G, 85Q650G, 43Q651G, 50Q651G, 55Q651G, 65Q651G, 75Q651G, 85Q651G, 98Q651G, 55Q670G, 65Q670G, 75Q670G, 85Q670G, 55Q681G, 65Q681G, 75Q681G, 85Q681G, 55Q750G, 65Q750G, 75Q750G, 85Q750G, 55Q650GQ6310, 65Q650GQ6310, 75Q650GQ6310, 85Q650GQ6310, 55Q650GQ6510, 65Q650GQ6510, 75Q650GQ6510, 85Q650GQ6510, 75Q691F; QM-Class televisions at leasing including the 65QM850G, 75QM850G, 85QM850G, 98QM850G, 55QM751G, 65QM751G, 75QM751G, 85QM751G, 98QM751G, 65QM851G, 75QM851G, 85QM851G, 98QM851G, 115QM891G. These additional products each include all necessary hardware and operating systems and work as described above with respect to the exemplary TCL television, the TCL 50S555. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '007 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

70.     Defendant has indirectly infringed at least claims 1, 2, 4, 5, 8, 9 and 10 of the '007 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '007 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '007 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the TCL 50S555 located at the following website: https://www.tcl.com/usca/content/dam/tcl/product/home-theater/5-series/download/5series_Roku_User_Guide_US-CA-8.1_0.pdf. Defendant is thereby liable for infringement of the '007 Patent pursuant to 35 U.S.C. § 271(b).

71.     Defendant has indirectly infringed at least claims 1, 2, 4, 5, 8, 9 and 10 of the '007 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '007 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '007 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

72.     For example, the '007 Accused Products include an input unit to which an image signal is input, an information acquirer for acquiring information concerning the input image signal, a frame rate converter, and a display unit for displaying the image. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial

24

non-infringing use. Thus, Defendant is liable for infringement of the '007 Patent pursuant to 35 U.S.C. § 271(c).

73.    Defendant has been on notice of the '007 Patent since at the latest, November 8, 2019. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1, 2, 4, 5, 8, 9, 10 and 12 of the '007 Patent.

74.    Defendant undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '007 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least November 8, 2019, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '007 Patent, and that the '007 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '007 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's knowledge of the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '007 Patent.

75.    Maxell has been damaged by Defendant's infringement of the '007 Patent.

## COUNT 2 – INFRINGEMENT OF U.S. PATENT NO. 7,730,507

76.    Maxell incorporates paragraphs 1-75 above by reference.

77.    U.S. Patent No. 7,730,507 (the "'507 Patent," attached hereto at Exhibit 2) duly issued on June 1, 2010 and is entitled *Broadcast Receiving Apparatus and Starting Method Thereof*.

78.     Maxell is the owner of the '507 Patent and possesses all rights under the '507 Patent, including the exclusive right to recover for past and future infringement.

79.     The '507 Patent is directed to a broadcast program receiving apparatus, such as a television. This apparatus is distinctively characterized by its design incorporating two separate waiting conditions, each with different levels of electric power consumption. In its lower power mode (the first waiting condition), critical components like the television's main decoder and the primary processor responsible for its operating system (referred to as the "second controller" in Claim 1 of the patent) are powered down. The patent operates within the relevant technical field of digital broadcast receiving apparatuses that perform signal processing.

80.     The '507 Patent explains that a significant problem plagued digital broadcast receiving systems, particularly in the 2005-2006 timeframe. As detailed in the patent's background section, "it takes times for receiving the digital broadcasting signal, in particular, just after turning ON an electric power of a set, until when it displays an image on a screen after receiving a channel, comparing to the receiving of the conventional analog broadcasting signal." '507 Patent at 1:45-50. This delay, which could amount to "about 10 seconds or more" (*Id*. at 1:61-62), was primarily due to the necessity of loading operating systems and initializing various devices. This extended boot-up period resulted in an unacceptable lag time that was "irritating to a viewer." *Id*. at 1:63-65.

81.     The '507 Patent solved these problems by, for example, providing a digital broadcast receiving apparatus featuring a first and a second waiting condition, during which no image is displayed. Claim 1 details that under the "first waiting condition," electric power is not supplied to the "second controller configured to be started up by a predetermined OS to control a processing of a received digital broadcasting signal via a decoder," nor to the decoder itself. This

creates a very low power standby state. In contrast, under the "second waiting condition," electric power is supplied to this second controller and the decoder, allowing these components to boot up or maintain a state of readiness in advance of a user's command to fully power on the display. This innovative approach, as stated in the patent's abstract, results in "shortening or reducing the waiting time after the startup of the apparatus with suppressing the electric power consumption under the waiting condition thereof" *Id.* at Abstract. This significantly improved the user experience by enabling a quick start, irrespective of the main CPU or OS boot requirements, while still effectively managing power consumption.  This solution was developed during a period (2005-2006) when high-definition digital TVs with HDMI interfaces were becoming mainstream, but "smart TVs" possessing such dual waiting conditions were not yet available. On information and belief, such advanced standby features were not readily available in the U.S. market until around 2011 and took even longer to become common.  During the 2005-2006 timeframe, televisions capable of quickly powering on to receive digital broadcasts without significant delay were not known, underscoring that the inventors conceived this solution (as early as August 25, 2006) well before the widespread adoption of similar technologies.

82.     Defendant has directly infringed one or more claims of the '507 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 2, 10, and 13 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the TCL 50S555 television.

83.     The TCL 50S555 is a smart television that can display programs received via digital broadcasting signal such as from, for example, a connected cable or VHF/UHF antenna. The TCL

50S555 includes a main board, a timing controller (T-CON) board, and a power board, containing various circuitry and components, as shown below:



84.    On information and belief, the TCL 50S555 includes processors and/or a processor with multiple cores that perform instructions such as those performed by its central processing unit. On information and belief, the System on Chip (SoC) architecture in the TCL 50S555 enables distinct functionalities equivalent to the "first controller" and "second controller" as claimed in the '507 Patent.

85.    Specifically, on information and belief, certain SoC functionalities, potentially utilizing dedicated low-power cores or specific power management units, operate as the first controller by managing the television's waiting modes (including lower-power standby states responsive to remote control signals) and controlling power distribution in a manner consistent with the claimed first controller's lower power consumption relative to the second controller.

86.    Concurrently, on information and belief, other primary cores within the same SoC function as the second controller. These cores are started up by a predetermined Operating System

to control the processing of received digital broadcasting signals via an associated decoder, thereby performing the main operational tasks of the television as claimed for the second controller.



### System on Chip (SoC)
Information about the central processor, graphic processor and the memory of the model.

| | |
|---|---|
| **Processor brand name**<br>Brand name of the processor trademarked by the manufacturer. | AiPQ Engine |
| **CPU cores**<br>The software instructions are performed by the CPU cores. The higher number of cores allows for the parallel (simultaneous) processing of more instructions and achieving higher performance. There are various processors equipped with 1, 2, 4, 6, 8, and more cores. | 4 |
| **GPU cores**<br>Similar to the CPU, the GPU may have more than one core, which serve for the parallel computing of various tasks and achieving better performance with various software applications. | 2 |



### OS, apps and software features
Information about the operating system, applications, various software features if available.

| | |
|---|---|
| **Operating system (OS)**<br>The operating systems of the smart TV sets feature user interface technologies for navigation and other ways of interaction with the smart TV - installing applications, internet browsing, video calls, sharing content with other users, playing videos and music, etc. | ▸ Roku TV |

The TCL 50S555 contains a first waiting condition, referred to as a very low power standby mode or standby mode, and a second waiting condition, called Fast TV Start Mode, which corresponds to a higher power mode. These are standby power modes that enable the display to power on faster and also allow it to be turned on by a command from another device, such as when casting onto the TV. The TCL 50S555 also contains the display, electric power source unit, and remote control signal receiving portion claimed by the '507 Patent. It operates such that the very

low power standby mode (first waiting condition) consumes less power than the higher power mode (Fast TV Start Mode), as no power is supplied to its second controller and decoder under the very low power standby mode.

## Standby LED On/Off

Normally, the status indicator is lit whenever the TV is in standby mode. If you prefer the status indicator to not be lit in standby mode, you can turn it off. To do so, from the Home screen, navigate to **Settings > System > Power > Standby LED**, and then select **Off**.

After making this change, the status indicator still performs all other indication functions.

## Fast TV start

*Only in connected mode on TV models that are not Energy Star certified,* you can enable **Fast TV start**. As you might expect, **Fast TV start** lets you start watching your TV almost instantly after turning it on. But it also enables other convenient features, such as the ability to turn on your TV using voice commands or the Roku mobile app.

Be aware that enabling Fast TV start makes your TV use somewhat more power when it is powered off to standby mode.

# Standby mode energy savings

When you turn off your TV, it remains in a higher power mode for a few minutes, after which it goes into a very low power standby mode. If you turn on the TV again before it has entered the very low power mode, it turns on immediately. After the TV goes into the lower power standby mode, it takes a few seconds longer to start up.

*Only in connected mode* on TVs that do not have an Energy Star® rating, you can optionally enable **Fast TV start**. When this option is enabled, your TV starts up almost immediately regardless of how long it has been turned off, but uses somewhat more power in standby mode. For more information, see Fast TV start.





87.     Under information and belief, processor(s) and/or component(s) of the TCL 50S555 control the power mode operations of the TCL 50S555, such as, for example, a processor or circuitry of the main board and T-CON controller for controlling the TV's waiting modes, and a processor or circuitry that is also configured to be started up by a predetermined OS to control a processing of a received digital broadcasting signal via a decoder.

88.     The foregoing features and capabilities of the TCL 50S555, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendant's direct infringement by satisfying every element of at least claims 1, 2, 10, 13, 14, and 15 of the '507 Patent, under 35 U.S.C. § 271(a).

89.     On information and belief, Defendant further infringes the '507 Patent through additional products (collectively, "the '507 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the TCL 50S555 television. The '507 Accused Products include, by way of examples, TCL's 3-Series televisions including at least the 32S21, 32S327, 32S330, 40S330, 32S331, 32S334, 40S334, 43S334, 32S335, 32S355, 40S355, 32S356, 32S357, 32S359; 4-Series televisions including at least the 55S21, 55S41, 65S41, 43S45, 50S45, 75S45, 43S421, 50S421, 55S421, 65S421, 75S421, 70S430, 43S431, 50S431, 55S431, 65S431, 75S431, 85S431, 75S433, 43S434, 50S434, 55S434, 65S434, 70S434, 75S434, 43S435, 50S435, 55S435, 65S435, 75S435, 85S435, 43S446, 50S446, 55S446, 65S446, 75S446, 85S446, 43S451, 50S451, 55S451, 65S451, 75S451, 85S451, 43S453, 50S453, 55S453, 65S453, 75S453, 43S455, 50S455, 55S455, 58S455, 65S455, 75S455, 85S455, 55S41R, 65S41R;5-Series televisions including at least the 55S531, 65S531, 50S535, 55S535, 65S535, 75S535, 50S546, 55S546, 65S546, 75S546, 50S555, 55S555, 65S555, 75S555, 55T551, 65T551, 65T554, 50T555, 55T555, 65T555, and 75T555; 6-Series televisions including at least the 55R635, 65R635,

75R635, 55R646, 65R646, 75R646, 65R648, 75R648, 55R655, 65R655, 75R655, 85R655; S-Class televisions including at least the 40S35F, 32S350F, 40S350F, 43S450F, 50S450F, 55S450F, 65S450F, 75S450F, 50S45G, 32S250G, 32S330G, 40S330G, 43S330G, 32S350G, 40S350G, 43S350G, 32S370G, 40S370G, 43S370G, 43S450G, 50S450G, 55S450G, 58S450G, 65S450G, 75S450G, 85S450G, 43S470G, 50S470G, 55S470G, 58S470G, 65S470G, 70S470G, 75S470G, 85S470G, 98S550G, 32S210R, 32S250R, 32S310R, 40S310R, 43S310R, 32S350R, 40S350R, 43S350R, 43S450R, 50S450R, 55S450R, 58S450R, 65S450R, 75S450R, 85S450R, 43S551F, 50S551F, 55S551F, 65S551F, 75S551F, 43S551G, 50S551G, 55S551G, 65S551G, 75S551G, 85S551G; Q-Class televisions including at least the 43Q570F, 55Q650F, 65Q650F, 75Q650F, 55Q651F, 65Q651F, 75Q651F, 50Q550G, 55Q550G, 65Q550G, 75Q570G, 55Q650G, 65Q650G, 75Q650G, 85Q650G, 43Q651G, 50Q651G, 55Q651G, 65Q651G, 75Q651G, 85Q651G, 98Q651G, 55Q670G, 65Q670G, 75Q670G, 85Q670G, 55Q681G, 65Q681G, 75Q681G, 85Q681G, 55Q750G, 65Q750G, 75Q750G, 85Q750G, 55Q650GQ6310, 65Q650GQ6310, 75Q650GQ6310, 85Q650GQ6310, 55Q650GQ6510, 65Q650GQ6510, 75Q650GQ6510, 85Q650GQ6510, 75Q691F; QM-Class televisions at leasing including the 65QM850G, 75QM850G, 85QM850G, 98QM850G, 55QM751G, 65QM751G, 75QM751G, 85QM751G, 98QM751G, 65QM851G, 75QM851G, 85QM851G, 98QM851G, 115QM891G. These additional products each include all necessary hardware and operating systems and work as described above with respect to the exemplary TCL television, the TCL 50S555. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '507 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

90.     Defendant has indirectly infringed at least claims 1, 2, 10, 13, 14, and 15 of the '507 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '507 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '507 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the TCL 50S555 located at the following website: https://www.tcl.com/usca/content/dam/tcl/product/home-theater/5-series/download/5series_Roku_User_Guide_US-CA-8.1_0.pdf Defendant is thereby liable for infringement of the '507 Patent pursuant to 35 U.S.C. § 271(b).

91.     Defendant has indirectly infringed least claims 1, 2, 10, 13, 14, and 15 of the '507 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '507 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '507 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

92.     For example, the '507 Accused Products include a remote sensor configured to receive a remote control signal for operating the display, and a processor with software for controlling a processing of a received digital broadcasting signal via a decoder. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for

substantial non-infringing use. Thus, Defendant is liable for infringement of the '507 Patent pursuant to 35 U.S.C. § 271(c).

93.     Defendant has been on notice of the '507 Patent since at least July 20, 2021. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1, 2, 10, and 13 of the '507 Patent.

94.     Defendant undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '507 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least July 20, 2021, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '507 Patent, and that the '507 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '507 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's knowledge of the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '507 Patent.

95.     Maxell has been damaged by Defendant's infringement of the '507 Patent.

## COUNT 3 – INFRINGEMENT OF U.S. PATENT NO. 8,970,793

96.     Maxell incorporates paragraphs 1-96 above by reference.

97.     U.S. Patent No. 8,970,793 (the "'793 Patent," attached hereto at Exhibit 3) duly issued on March 3, 2015 and is entitled *Display Device, and Television Device*.

98.     Maxell is the owner by assignment of the '793 Patent and possesses all rights under the '793 Patent, including the exclusive right to recover for past and future infringement.

99.     The '793 Patent is directed to a display device and a television device, each of which includes a display panel with a backlight source. '793 Patent at Abstract, 1:4-8. The core aim of the invention is to inhibit light from this backlight source from leaking outward, particularly through the corner portions of the device. *Id* at 1:56-60.

100.    The '793 Patent explains that a problem existed in conventional television receiving devices concerning light leakage. Describing prior art, the patent notes that in such devices, "clearances are formed on corner portions of outer peripheral portions of the respective ones of the bezel, the frame and the chassis, and hence there is such a problem that the light from the LED light sources leaks out of the liquid crystal display device through clearances on respective ones of corner portions of the liquid crystal display device." *Id*. at 1:49-55. This light leakage could negatively affect the visual quality and aesthetics of the display.

101.    The '793 Patent solved these problems by providing a display device with a specific construction for its substrate mounting member, which covers the backlight source. The patent specifies that "the substrate mounting member has a bottom surface portion and a side surface portion, while a corner portion of the outer peripheral portion formed by the side surface portion of the substrate mounting member has such a shape that adjacent ones of the side surface portion are bonded to each other without a clearance." *Id*. at Abstract, 2:10-18. This design ensures that "light from the backlight source covered with the substrate mounting member can be inhibited from leaking outward through the corner portion of the substrate mounting member." *Id*. at 2:18-24. This is particularly effective even when a cover member is arranged to expose the periphery

of this outer peripheral portion of the substrate mounting member, as the sealed corners prevent light escape. *Id.* at 2:24-31.

102.    Defendant has directly infringed one or more claims of the '793 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 2, 5, 7, 8, 9, 10, 11, 13, and 16 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the TCL 43S450R television.

103.    The TCL 43S450R is a television comprising a liquid crystal display (LCD) panel, a backlight source comprising an array of LEDs positioned behind the LCD panel, and a substrate mounting member comprising a metal frame located behind the LED array, wherein the substrate mounting member covers the backlight source.



104.    The TCL 43S450R contains a cover that partially covers the rear surface of the substrate mounting member, covering the mainboard circuits and speaker, and exposing a region of the substrate mounting member.



105.    The bottom and side portions of the TCL 43S450R's substrate mounting member are joined together at their adjacent sides without significant gap or clearance. At the corners where these portions join, the outer peripheral surface of the substrate mounting member is formed to have a round shape.



106.    The 43S450R includes a circuit board mounted on the substrate mounting member, which generates heat during operation. The exposed region on the rear surface of the TCL 43S450R's substrate mounting member is configured as a heat radiation portion. This exposed

region radiates heat generated by at least the circuit board outward from the television. The configuration of the exposed region improves its heat transfer properties compared to regions of the substrate mounting member covered by the cover member.



107.    Further, the bottom surface of the exposed region has a convex shape swelling toward the rear surface side.



108.    The circuit board of the TCL 43S450R has an external connection terminal attached, including standard ports such as HDMI, USB, Ethernet, and Antenna/Cable In. This external connection terminal has an opening to the side underneath the cover.



109.    The foregoing features and capabilities of the TCL 43S450R, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendant's direct infringement by satisfying every element of at least claims 1, 2, 5, 7, 8, 9, 10, 11, 13, and 16 of the '793 Patent, under 35 U.S.C. § 271(a).

110.    On information and belief, Defendant further infringes the '793 Patent through additional products (collectively, "the '793 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the TCL 43S450R television. The '793 Accused Products include, by way of examples, TCL's 3-Series televisions including at least the 32S21, 32S327, 32S330, 40S330, 32S331, 32S334, 40S334, 43S334, 32S335, 32S355, 40S355, 32S356, 32S357, 32S359; 4-Series televisions including at least the 55S21, 55S41, 65S41, 43S45, 50S45, 75S45, 43S421, 50S421, 55S421, 65S421, 75S421, 70S430, 43S431, 50S431, 55S431, 65S431, 75S431, 85S431, 75S433, 43S434, 50S434, 55S434, 65S434, 70S434, 75S434, 43S435, 50S435, 55S435, 65S435, 75S435, 85S435, 43S446, 50S446, 55S446, 65S446, 75S446, 85S446, 43S451, 50S451, 55S451, 65S451, 75S451, 85S451, 43S453, 50S453, 55S453, 65S453, 75S453, 43S455, 50S455, 55S455, 58S455, 65S455, 75S455, 85S455, 55S41R, 65S41R;5-Series

televisions including at least the 55S531, 65S531, 50S535, 55S535, 65S535, 75S535, 50S546, 55S546, 65S546, 75S546, 50S555, 55S555, 65S555, 75S555, 55T551, 65T551, 65T554, 50T555, 55T555, 65T555, and 75T555; 6-Series televisions including at least the 55R635, 65R635, 75R635, 55R646, 65R646, 75R646, 65R648, 75R648, 55R655, 65R655, 75R655, 85R655; S-Class televisions including at least the 40S35F, 32S350F, 40S350F, 43S450F, 50S450F, 55S450F, 65S450F, 75S450F, 50S45G, 32S250G, 32S330G, 40S330G, 43S330G, 32S350G, 40S350G, 43S350G, 32S370G, 40S370G, 43S370G, 43S450G, 50S450G, 55S450G, 58S450G, 65S450G, 75S450G, 85S450G, 43S470G, 50S470G, 55S470G, 58S470G, 65S470G, 70S470G, 75S470G, 85S470G, 98S550G, 32S210R, 32S250R, 32S310R, 40S310R, 43S310R, 32S350R, 40S350R, 43S350R, 43S450R, 50S450R, 55S450R, 58S450R, 65S450R, 75S450R, 85S450R, 43S551F, 50S551F, 55S551F, 65S551F, 75S551F, 43S551G, 50S551G, 55S551G, 65S551G, 75S551G, 85S551G; Q-Class televisions including at least the 43Q570F, 55Q650F, 65Q650F, 75Q650F, 55Q651F, 65Q651F, 75Q651F, 50Q550G, 55Q550G, 65Q550G, 75Q570G, 55Q650G, 65Q650G, 75Q650G, 85Q650G, 43Q651G, 50Q651G, 55Q651G, 65Q651G, 75Q651G, 85Q651G, 98Q651G, 55Q670G, 65Q670G, 75Q670G, 85Q670G, 55Q681G, 65Q681G, 75Q681G, 85Q681G, 55Q750G, 65Q750G, 75Q750G, 85Q750G, 55Q650GQ6310, 65Q650GQ6310, 75Q650GQ6310, 85Q650GQ6310, 55Q650GQ6510, 65Q650GQ6510, 75Q650GQ6510, 85Q650GQ6510, 75Q691F. These additional products each include all necessary hardware and operating systems and work as described above with respect to the exemplary TCL television, the TCL 43S450R. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '793 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and

infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

111.     Defendant has indirectly infringed at least claims 1, 2, 5, 7, 8, 9, 10, 11, 13, and 16 of the '793 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '793 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '793 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the TCL 43S450R located at the following website: https://www.tcl.com/usca/content/dam/tcl/product/home-theater/4-series/download/4-Series-Roku-User-Guide_US-CA-8.1_4.pdf. Defendant is thereby liable for infringement of the '793 Patent pursuant to 35 U.S.C. § 271(b).

112.     Defendant has indirectly infringed at least claims 1, 2, 5, 7, 8, 9, 10, 11, 13, and 16 of the '793 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '793 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '793 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

113.     For example, the '793 Accused Products include hardware that is designed to prevent light leakage from the backlight source. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore,

such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '793 Patent pursuant to 35 U.S.C. § 271(c).

114.    Defendant has been on notice of the '793 Patent since at least January 17, 2025. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1, 2, 5, 7, 8, 9, 10, 11, 13 and 16 of the '793 Patent.

115.    Defendant undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '793 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least January 17, 2025, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '793 Patent, and that the '793 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '793 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's knowledge of the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '793 Patent.

116.    Maxell has been damaged by Defendant's infringement of the '793 Patent.

### COUNT 4 – INFRINGEMENT OF U.S. PATENT NO. 10,459,270

117.    Maxell incorporates paragraphs 1-116 above by reference.

118.    U.S. Patent No. 10,459,270 (the "'270 Patent," attached hereto at Exhibit 4) duly issued on October 29, 2019 and is entitled *Display Device*.

119.    Maxell is the owner by assignment of the '270 Patent and possesses all rights under the '270 Patent, including the exclusive right to recover for past and future infringement.

120.    The '270 Patent is directed to a display device. This device includes a display, at least one light source unit (which comprises a light source, a diffusing lens that covers the light source, and a substrate to which the light source is mounted), a housing to which the at least one light source unit is attached via its inner surface, and a reflective sheet. A key feature of the light source assembly is that the reflective sheet has a plurality of holes corresponding to the light sources and is positioned between the substrate and the diffusing lens. '270 Patent at Abstract.

121.    The '270 Patent explains that conventional display devices encountered issues related to component count and assembly complexity, particularly when positioning and fixing heat dissipation members (associated with light sources) to holding members like back panels. Specifically, the use of separate fasteners such as nuts and bolts resulted in an increased "number of required parts, and the work entailed by tightening the nuts and bolts increases the number of assembly steps." *Id*. at 1:38-45.

122.    The '270 Patent solved these problems by providing a display device designed to reduce the number of parts and assembly steps. *Id*. at 1:55-57. This is exemplified by a design where the sheet metal holding member (referred to as a rear frame in the detailed description) integrally includes features such as a positioning component for a heat dissipation member and a fixing component for securing the positioned heat dissipation member without requiring separate fasteners like nuts and bolts. *Id*. at 7:4-11. This integral design approach directly reduces both the number of individual parts and the complexity of the assembly process. The patent also describes that such positioning components can include features designed to suppress the warping of the heat dissipation member that might occur due to heat generated from the light source. The light source

44

unit itself, as mentioned, comprises a light source, a diffusing lens, and a substrate, with the reflective sheet (which has holes for the light sources) carefully disposed between the substrate and the diffusing lens. The housing facilitates this assembly by having an inner surface to which the light source unit is attached, and specific positioning portions on the housing are used to hold the light source unit in place. *Id.* at Abstract.

123.    Defendant has directly infringed one or more claims of the '270 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 4, 5, 6, 10, 11, and 12 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the TCL 43S450R television.

124.    The TCL 43S450R is a television that includes a display utilizing an LED-based backlight system to illuminate its display panel. This system includes multiple light source units, each comprising an LED light and a diffusing lens that covers the LED light to spread the concentrated light from the LED outward. These two components make up a light source unit, which is mounted on top of the substrate, for example, a circuit board strip.



125.    The TCL 43S450R includes a housing wherein the light source units are attached. Further, a white plastic reflective sheet has holes that align with the light source units. This sheet is positioned between the substrate and the light source units.





126.    The housing of the TCL 43S450R contains integrally formed features – specifically, the embossed, peg-like protrusions. These protrusions, for example, function as the "positioning portion." These embossed pegs physically engage the substrate by inserting into holes located along the center of the substrate strip on which the light source units are mounted. This physical engagement restricts the movement of the substrate and secures its location and orientation relative to the housing. This securing function demonstrates that the "positioning

"portion" holds the light source unit. Additionally, black adhesive material, which acts as the "contact component," is applied to attach the substrate to the housing.



127.    The main structural rear panel of the television, a large piece of sheet metal forming the back cover, serves as the back housing. This extensive metal structure is capable of absorbing and spreading thermal energy from the LEDs, thereby functioning effectively as the "heat dissipation member."

**Light Source Units in Accused Product**



Diffusing lens over Light Source          Substrate

| Housing | Positioning portion | Light Source Unit |
| --- | --- | --- |



| Light Source Unit with heat dissipation member | Positioning portion with contact component |
| --- | --- |

128.    The housing has a rectangular shape, and the light source units are arranged longitudinally, running horizontally across the width of the display module.



129.    Further, the TCL 43S450R housing also contains additional "positioning portions" situated adjacent to both the left and right longitudinal ends of the horizontal light source units (LED strips).



Positioning portions

130.    The inner surface of the housing has a recess, comprising horizontal indentations formed therein, that extends in a transverse direction of the housing.



131.    The foregoing features and capabilities of the TCL 43S450R, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendant's direct infringement by satisfying every element of at least claims 1, 4, 5, 6, 10, 11, and 12 of the '270 Patent, under 35 U.S.C. § 271(a).

132.    On information and belief, Defendant further infringes the '270 Patent through additional products (collectively, "the '270 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the TCL 43S450R television. The '270 Accused Products include, by way of examples, TCL's 3-Series televisions including at least the 32S21, 32S327, 32S330, 40S330, 32S331, 32S334, 40S334, 43S334, 32S335, 32S355, 40S355, 32S356, 32S357, 32S359; 4-Series televisions including at least the 55S21, 55S41, 65S41, 43S45, 50S45, 75S45, 43S421, 50S421, 55S421, 65S421, 75S421, 70S430, 43S431, 50S431, 55S431,

65S431, 75S431, 85S431, 75S433, 43S434, 50S434, 55S434, 65S434, 70S434, 75S434, 43S435, 50S435, 55S435, 65S435, 75S435, 85S435, 43S446, 50S446, 55S446, 65S446, 75S446, 85S446, 43S451, 50S451, 55S451, 65S451, 75S451, 85S451, 43S453, 50S453, 55S453, 65S453, 75S453, 43S455, 50S455, 55S455, 58S455, 65S455, 75S455, 85S455, 55S41R, 65S41R;S-Class televisions including at least the 40S35F, 32S350F, 40S350F, 43S450F, 50S450F, 55S450F, 65S450F, 75S450F, 50S45G, 32S250G, 32S330G, 40S330G, 43S330G, 32S350G, 40S350G, 43S350G, 32S370G, 40S370G, 43S370G, 43S450G, 50S450G, 55S450G, 58S450G, 65S450G, 75S450G, 85S450G, 43S470G, 50S470G, 55S470G, 58S470G, 65S470G, 70S470G, 75S470G, 85S470G, 98S550G, 32S210R, 32S250R, 32S310R, 40S310R, 43S310R, 32S350R, 40S350R, 43S350R, 43S450R, 50S450R, 55S450R, 58S450R, 65S450R, 75S450R, 85S450R, 43S551F, 50S551F, 55S551F, 65S551F, 75S551F, 43S551G, 50S551G, 55S551G, 65S551G, 75S551G, 85S551G. These additional products each include all necessary hardware and operating systems and work as described above with respect to the exemplary TCL television, the TCL 43S450R. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '270 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

133.    Defendant has indirectly infringed at least claims 1, 4, 5, 6, 10, 11, and 12 of the '270 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '270 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more

claims of the '270 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the TCL 43S450R located at the following website: https://www.tcl.com/usca/content/dam/tcl/product/home-theater/4-series/download/4-Series-Roku-User-Guide_US-CA-8.1_4.pdf. Defendant is thereby liable for infringement of the '270 Patent pursuant to 35 U.S.C. § 271(b).

134.    Defendant has indirectly infringed at least claims 1, 4, 5, 6, 10, 11, and 12 of the '270 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '270 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '270 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

135.    For example, the '270 Accused Products include hardware that is designed to improve display device assembly by using a housing with a specific positioning portion to hold the light source unit, reducing the number of parts and steps. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '270 Patent pursuant to 35 U.S.C. § 271(c).

136.    Defendant has been on notice of the '270 Patent since at least January 17, 2025. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1, 4, 5, 6, 10, 11, and 12 of the '270 Patent.

137.    Defendant undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '270 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least January 17, 2025, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '270 Patent, and that the '270 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '270 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's knowledge of the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '270 Patent.

138.    Maxell has been damaged by Defendant's infringement of the '270 Patent.

## COUNT 5 – INFRINGEMENT OF U.S. PATENT NO. 9,746,710

139.    Maxell incorporates paragraphs 1-138 above by reference.

140.    U.S. Patent No. 9,746,710 (the "'710 Patent," attached hereto at Exhibit 5) duly issued on August 29, 2017, and is entitled *Quantum Dot Light Source Device, Backlight Module And Liquid Crystal Display Device*.

141.    Maxell is the owner by assignment of the '710 Patent and possesses all rights under the '710 Patent, including the exclusive right to recover for past and future infringement.

142.    The '710 Patent is directed to a quantum dot light source device, a backlight module that includes such a device, and a liquid crystal display device incorporating this module, all of which aim to achieve uniform color output from the quantum dot light sources. '710 Patent at Abstract, 2:60-65. The quantum dot light source device generally comprises a printed circuit board

54

(PCB) with an LED light-emitting chip and a quantum dot package component, packaged together in a closed cavity.

143.    The '710 Patent explains that a problem of color non-uniformity arises from the typical interaction between LED light sources and quantum dot layers. Specifically, due to the emission characteristics of LEDs, "there are more photons passing the center of the quantum dot layer, and less photons passing an edge thereof away from the center thereof, so if the quantum dot material is distributed uniformly at the quantum dot layer, then there will be an excessive blue component light at the center, thus resulting in a bluish display, and an insufficient blue component light at the edge, thus resulting in a yellowish display, which may cause the light rays emitted at the different positions in the quantum dot light source device to vary in color." *Id*. at 2:34-43.

144.    The '710 Patent solved these problems by arranging "at least one reflection point ... on the upper substrate" of the quantum dot package component, with the design ensuring that "there are more light rays reflected by the at least one reflection point at the center of the upper substrate than light rays reflected at the peripheral edges of the upper substrate." *Id*. at 2:28:32. These reflection points are typically on the inner wall of the upper substrate, facing the quantum dot material layer. *Id*. at 5:56-63. This configuration means that at the center of the device, where the blue light from the LED is most intense, a higher proportion of this light (including both direct blue light and initially converted light) is reflected back into the quantum dot material layer. This "reflected light rays excites again the quantum dot material in the quantum dot material layer ... , and is converted again into green and red excited light, thus raising the proportion of the green and red light, and lowering the proportion of the blue light" in the light finally transmitted through the central portion of the upper substrate. *Id*. at 6:6-14.   By carefully arranging these reflection points—for example, by decreasing the density of reflection points from the center to the edges,

or by making reflection points at the center larger than those at the edges (*Id*. at 6:56-7:14)—the color of the light emitted from different positions across the quantum dot light source device can be made "substantially unvarying." *Id*. at 5:1-3. This method counteracts the non-uniform light distribution from the LED, leading to more consistent color output. The quantum dot package component itself typically includes an upper substrate and a lower substrate, with the quantum dot material layer packaged between them, and this assembly is housed in a closed cavity along with the LED light-emitting chip mounted on a PCB.

145.    Defendant has directly infringed one or more claims of the '710 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 10, and 19 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the TCL 43Q651G television.

146.    The TCL 43Q651G is a television that uses a liquid crystal display enhanced with quantum dots and illuminated by an LED backlight.



MODEL 43Q651G

## TCL 43″ Q CLASS 4K UHD HDR QLED SMART TV WITH GOOGLE TV – 43Q651G

★★★★★  4.8 (243)  Write a review

- 4K UltraHD Resolution
- QLED PRO – Quantum Dot Technology
- High Brightness+ LED Backlight
- TCL AIPQ Processor with Deep Learning AI
- HDR PRO+ with Dolby Vision, HDR10+, HDR10, & HLG
- Motion Rate 240 with MEMC Frame Insertion
- Auto Game Mode (ALLM)
- Dolby Atmos Audio
- Enhanced Dialogue Mode
- DTS Virtual:X
- Bluetooth Personal Audio
- 3 HDMI Inputs including one with eARC
- Wi-Fi 5
- Google TV Smart OS with Voice Remote
- Google Chromecast Built-in

| Display | |
|---|---|
| Display Technology | QLED |
| Panel Refresh Rate | 60Hz |
| Panel Resolution | 4K Ultra HD (3840 x 2160) |
| Display Colors | 1.07 billion |
| High Dynamic Range Format | HDR PRO+ (Dolby Vision, HDR10+, HDR10, HLG) |

147.    The TCL 43Q651G includes a printed circuit board and a quantum dot package component packaged into a closed cavity through a package bracket. The printed circuit board

powers the device, and an LED light-emitting chip on the board inside the cavity generates exciting light.



148.    The quantum dot package component has upper and lower substrates with a quantum dot material layer packaged between them. This layer is excited by the exciting light to generate excited light.



Lower substrate

Upper substrate

Packaged component

quantum dot material - packaged between the upper substrate and the lower substrate.



Excited light generated by quantum dot material layer

149.    The upper substrate has at least one reflection point arranged such that more light rays are reflected at the center than at the peripheral edge.



peripheral edges

150.    The TCL 43Q651G also contains a backlight module comprising a fixing component to assemble the module, the quantum dot light source device, and a light-uniformizing component. The quantum dot light source device is located at the light incidence side of the light-uniformizing component, which processes the light into a planar light source projected onto the liquid crystal display panel arranged above the backlight module.

Fixing component part of metal frame



backlight module

quantum dot light source device, and a light-uniformizing component



Fixing component - part of metal frame



151.    The foregoing features and capabilities of the TCL 43Q651G, and Defendant's description and/or demonstration thereof, including in user manuals, technical specifications, teardown analyses, and advertising, reflect Defendant's direct infringement by satisfying every element of at least claims 1, 10, and 19 of the '710 Patent, under 35 U.S.C. § 271(a).

152.    On information and belief, Defendant further infringes the '710 Patent through additional products (collectively, "the '710 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the TCL 43Q651G television. The '710 Accused Products include, by way of example, TCL's Q-Class televisions including at least the 43Q570F, 55Q650F, 65Q650F, 75Q650F, 55Q651F, 65Q651F, 75Q651F, 50Q550G, 55Q550G, 65Q550G, 75Q570G, 55Q650G, 65Q650G, 75Q650G, 85Q650G, 43Q651G, 50Q651G, 55Q651G, 65Q651G, 75Q651G, 85Q651G, 98Q651G, 55Q670G, 65Q670G, 75Q670G, 85Q670G, 55Q681G, 65Q681G, 75Q681G, 85Q681G, 55Q750G, 65Q750G, 75Q750G, 85Q750G, 55Q650GQ6310, 65Q650GQ6310, 75Q650GQ6310, 85Q650GQ6310, 55Q650GQ6510, 65Q650GQ6510, 75Q650GQ6510, 85Q650GQ6510, 75Q691F; QM-Class

televisions at leasing including the 65QM850G, 75QM850G, 85QM850G, 98QM850G, 55QM751G, 65QM751G, 75QM751G, 85QM751G, 98QM751G, 65QM851G, 75QM851G. These additional products each include all necessary hardware and operating systems and work as described above with respect to the exemplary TCL television, the TCL 43Q651G. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '710 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

153.    Defendant has indirectly infringed at least claims 1, 10, and 19 of the '710 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '710 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '710 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the TCL 43Q651G located on the following website: https://www.tcl.com/usca/content/dam/tcl/product/home-theater/5-series/download/GoogleTV%20User%20Guide_US0929.pdf. Defendant is thereby liable for infringement of the '710 Patent pursuant to 35 U.S.C. § 271(b).

154.    Defendant has indirectly infringed at least claims 1, 10, and 19 of the '710 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '710 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in

practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '710 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

155.    For example, the '710 Accused Products include the quantum dot light source device comprising the specific arrangement of PCB, LED chip, quantum dot package component (with upper/lower substrates, quantum dot material, and reflection points), and package bracket, as well as the backlight module with its fixing component and light-uniformizing component arranged relative to the light source device and LCD panel. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '710 Patent pursuant to 35 U.S.C. § 271(c).

156.    Defendant has been on notice of the '710 Patent since at least January 17, 2025. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1, 10, and 19 of the '710 Patent.

157.    Defendant undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '710 Patent, which has been duly issued by the USPTO, and is presumed valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '710 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's knowledge

of the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '710 Patent.

158.    Maxell has been damaged by Defendant's infringement of the '710 Patent.

## COUNT 6 – INFRINGEMENT OF U.S. PATENT NO. 11,924,502

159.    Maxell incorporates paragraphs 1-158 above by reference.

160.    U.S. Patent No. 11,924,502 (the "'502 Patent," attached hereto at Exhibit 6) duly issued on March 5, 2024, and is entitled *Multimedia Player Displaying Operation Panel Depending On Contents.*

161.    Maxell is the owner of the '502 Patent and possesses all rights under the '502 Patent, including the exclusive right to recover for past and future infringement.

162.    With the rise of digital media, multimedia players saw a sharp expansion in their capabilities. Beyond simply being able to pause, rewind, and fast forward  digital content, conventional apparatus also provided a host of other features for the selection and control of digital content.

163.    However, with the ever-expanding features also came ever-expanding control panels, typically in the form of graphical user interfaces (GUIs). New features meant the introduction of the new keys or buttons to control those features, which in turn lead to increasingly cluttered GUIs. These expanding GUIs often required larger screens or the partial or complete overlay of whatever digital content happened to be playing at the time.

164.    Recognizing these problems, the inventors of the '502 Patent set out to design a multimedia player that would show users only the buttons of particular interest at any given time.

165.    In one of the solutions described in the'502 Patent, a multimedia device includes the capability to display separate content control interfaces, which the patent refers to as "content

operation panels." For example, the patent teaches the use of a "linear content operation panel" to control the playback of digital content with features such as pause, rewind, and fast forward, whereas a separate "interactive content operation panel" included other features involving the selection and sharing of digital content. The '502 Patent further discloses "attribute information" pertaining to an appreciation term and viewing history for the digital content.

166.    In one exemplary embodiment, the '502 Patent teaches that each of these operation panels include separate buttons, and that the two panels are not displayed at the same time. The teachings of the '502 Patent thereby reduced the overall size of these operational panels, thereby allowing for digital content to continue being displayed while a user selects a desired operation.

167.    Defendant has directly infringed one or more claims of the '502 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 4, 6, 11, 12, 15, 17, and 22 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the TCL 43S450R television.

168.    The TCL 43S450R is a smart television that plays digital content obtained through its various network connectors, including its Wi-Fi interface (Dual-Band 802.11ac) and an Ethernet port. These connections allow it to receive content, such as rented movies from services like Amazon Prime Video, over a network.







169.    When the TCL 43S450R smart TV receives digital content, such as a movie rented via Amazon Prime Video, this content includes specific attribute information. This involves details like a rental term and information on viewing history, often shown as a progress bar.





170.    The TCL 43S450R television uses its internal processing components to receive user commands from a remote controller, allowing for navigation and operation. It also employs its processor (which can include elements like an ISP, DSP, and/or GPU) and software applications like Amazon Prime Video to reproduce the received digital content.



171.   A renderer within the smart TV, driven by its processor, creates the image data for display. This image data shows the digital content with either a "linear content operation panel" (for playback controls like play, pause, or rewind) or an "interactive content operation panel" (for options like choosing subtitles or language, which may involve communication with external servers) superimposed on the content. The TCL 43S450R's screen then displays this combined image data.









172.    A controller, typically the television's main processor running its operating system (like Roku OS), manages how these linear and interactive content operation panels are displayed. These two types of panels are distinct from each other and are not simply variations created by disabling buttons. The controller ensures that only one panel type is displayed exclusively at any given moment, along with the ongoing digital content. The decision to display a particular panel is also influenced by the content's attribute information (like a valid rental period) and user actions (such as initiating playback).







173.    The foregoing features and capabilities of the TCL 43S450R, and Defendant's description and/or demonstration thereof, including in user manuals, technical specifications, teardown analyses, and advertising, reflect Defendant's direct infringement by satisfying every element of at least claims 1, 4, 6, 11, 12, 15, 17, and 22 of the '502 Patent, under 35 U.S.C. § 271(a).

174.    On information and belief, Defendant further infringes the '502 Patent through additional products (collectively, "the '502 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the TCL 43S450R television. The '502 Accused Products include, by way of examples, TCL's 3-Series televisions including at least the 32S21, 32S327, 32S330, 40S330, 32S331, 32S334, 40S334, 43S334, 32S335, 32S355, 40S355, 32S356, 32S357, 32S359; 4-Series televisions including at least the 55S21, 55S41, 65S41, 43S45, 50S45, 75S45, 43S421, 50S421, 55S421, 65S421, 75S421, 70S430, 43S431, 50S431, 55S431, 65S431, 75S431, 85S431, 75S433, 43S434, 50S434, 55S434, 65S434, 70S434, 75S434, 43S435, 50S435, 55S435, 65S435, 75S435, 85S435, 43S446, 50S446, 55S446, 65S446, 75S446, 85S446, 43S451, 50S451, 55S451, 65S451, 75S451, 85S451, 43S453, 50S453, 55S453, 65S453, 75S453,

43S455, 50S455, 55S455, 58S455, 65S455, 75S455, 85S455, 55S41R, 65S41R;5-Series televisions including at least the 55S531, 65S531, 50S535, 55S535, 65S535, 75S535, 50S546, 55S546, 65S546, 75S546, 50S555, 55S555, 65S555, 75S555, 55T551, 65T551, 65T554, 50T555, 55T555, 65T555, and 75T555; 6-Series televisions including at least the 55R635, 65R635, 75R635, 55R646, 65R646, 75R646, 65R648, 75R648, 55R655, 65R655, 75R655, 85R655; S-Class televisions including at least the 40S35F, 32S350F, 40S350F, 43S450F, 50S450F, 55S450F, 65S450F, 75S450F, 50S45G, 32S250G, 32S330G, 40S330G, 43S330G, 32S350G, 40S350G, 43S350G, 32S370G, 40S370G, 43S370G, 43S450G, 50S450G, 55S450G, 58S450G, 65S450G, 75S450G, 85S450G, 43S470G, 50S470G, 55S470G, 58S470G, 65S470G, 70S470G, 75S470G, 85S470G, 98S550G, 32S210R, 32S250R, 32S310R, 40S310R, 43S310R, 32S350R, 40S350R, 43S350R, 43S450R, 50S450R, 55S450R, 58S450R, 65S450R, 75S450R, 85S450R, 43S551F, 50S551F, 55S551F, 65S551F, 75S551F, 43S551G, 50S551G, 55S551G, 65S551G, 75S551G, 85S551G; Q-Class televisions including at least the 43Q570F, 55Q650F, 65Q650F, 75Q650F, 55Q651F, 65Q651F, 75Q651F, 50Q550G, 55Q550G, 65Q550G, 75Q570G, 55Q650G, 65Q650G, 75Q650G, 85Q650G, 43Q651G, 50Q651G, 55Q651G, 65Q651G, 75Q651G, 85Q651G, 98Q651G, 55Q670G, 65Q670G, 75Q670G, 85Q670G, 55Q681G, 65Q681G, 75Q681G, 85Q681G, 55Q750G, 65Q750G, 75Q750G, 85Q750G, 55Q650GQ6310, 65Q650GQ6310, 75Q650GQ6310, 85Q650GQ6310, 55Q650GQ6510, 65Q650GQ6510, 75Q650GQ6510, 85Q650GQ6510, 75Q691F; QM-Class televisions at leasing including the 65QM850G, 75QM850G, 85QM850G, 98QM850G, 55QM751G, 65QM751G, 75QM751G, 85QM751G, 98QM751G, 65QM851G, 75QM851G, 85QM851G, 98QM851G, 115QM891G. These additional products each include all necessary hardware and operating systems and work as described above with respect to the exemplary TCL television, the TCL 43S450R. Maxell reserves the right to

discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '502 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

175.     Defendant has indirectly infringed at least claims 1, 4, 6, 11, 12, 15, 17, and 22 of the '502 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '502 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '502 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the TCL 43S450R located on the following website: https://www.tcl.com/usca/content/dam/tcl/product/home-theater/4-series/download/4-Series-Roku-User-Guide_US-CA-8.1_4.pdf. Defendant is thereby liable for infringement of the '502 Patent pursuant to 35 U.S.C. § 271(b).

176.     Defendant has indirectly infringed at least claims 1, 4, 6, 11, 12, 15, 17, and 22 of the '502 Patent, by, among other things, contributing to the direct infringement of others, including customers of the '502 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '502 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

177.     For example, the '502 Accused Products include the specific combination of a network connector for receiving digital content associated with attribute information (like

appreciation terms and viewing history), a user operation receiver for commands via a remote controller, a content reproducer, a renderer for generating image data with superimposed and distinct linear or interactive content operation panels, a display for such image data, and a controller that manages the alternative and exclusive display of these panels based on content attributes and user interaction. These elements and their specific interoperation constitute a patented machine, manufacture, or combination, and are integral to the apparatus for use in practicing the patented process of displaying operation panels dependent on content. Furthermore, such a combination of specifically configured components and functionalities forms a material part of the invention of the '502 Patent. Upon information and belief, this specific combination and mode of operation are not staple articles or commodities of commerce suitable for substantial non-infringing use, particularly as they are designed to enable the patented method of content and panel management. Thus, Defendant is liable for infringement of the '502 Patent pursuant to 35 U.S.C. § 271(c).

178.    Defendant has been on notice of the '502 Patent since at least August 21, 2024. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1, 7, and 14 of the '502 Patent.

179.    Defendant undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '502 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least August 21, 2024, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '502 Patent, and that the '502 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement

of the '502 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite

that knowledge and subjective belief, and the objectively high likelihood that its actions constitute

infringement, Defendant has continued its infringing activities. As such, and based on Defendant's

knowledge of the strength and value of Maxell's portfolio due to the prior licensing and negotiation

history set forth in this complaint, Defendant willfully infringes the '502 Patent.

180.     Maxell has been damaged by Defendant's infringement of the '502 Patent.

## PRAYER FOR RELIEF

WHEREFORE, Maxell prays for relief as follows:

181.     A judgment declaring that TCL has infringed and is infringing one or more claims

of the '007, '507, '793, '270, '710, and '502 Patents;

182.     A judgment awarding Maxell compensatory damages as a result of TCL's

infringement of one or more claims of the '007, '507, '793, '270, '710, and '502 Patents, together

with interest and costs, consistent with lost profits and in no event less than a reasonable royalty;

183.     A judgment awarding Maxell treble damages and pre-judgment interest under 35

U.S.C. § 284 as a result of TCL's willful and deliberate infringement of one or more claims of the

'007, '507, '793, '270, '710, and '502 Patents;

184.     A judgment declaring that this case is exceptional and awarding Maxell its

expenses, costs, and attorneys' fees in accordance with 35 U.S.C. §§ 284 and 285 and Rule 54(d)

of the Federal Rules of Civil Procedure;

185.     A grant of preliminary and permanent injunctions enjoining TCL from further acts

of infringement of one or more claims of the '007, '507, '793, '270, '710, and '502 Patents; and

186.     Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Maxell hereby demands a trial by jury.

Dated: May 30, 2025                    By: /s/ Geoffrey Culbertson
                                           Geoff Culbertson
                                           Kelly Tidwell
                                           Patton, Tidwell & Culbertson, LLP
                                           2800 Texas Boulevard (75503)
                                           Post Office Box 5398
                                           Texarkana, TX 75505-5398
                                           Telephone: (903) 792-7080
                                           Facsimile: (903) 792-8233
                                           gpc@texarkanalaw.com
                                           kbt@texarkanalaw.com


                                           Jamie B. Beaber
                                           Kfir B. Levy
                                           Michael L. Lindinger
                                           Alan Grimaldi
                                           Alison T. Gelsleichter
                                           Tiffany A. Miller
                                           Julia Haines
                                           Courtney M. Krawice
                                           Claire "Young Kyoung" Kim
                                           Tatsuya Koyama
                                           MAYER BROWN LLP
                                           1999 K Street, NW
                                           Washington, DC 20006
                                           Telephone:(202) 263-3000
                                           Facsimile: (202) 263-3300
                                           jbeaber@mayerbrown.com
                                           klevy@mayerbrown.com
                                           mlindinger@mayerbrown.com
                                           agrimaldi@mayerbrown.com
                                           agelsleichter@mayerbrown.com
                                           tmiller@mayerbrown.com
                                           jhaines@mayerbrown.com
                                           ckrawice@mayerbrown.com
                                           clairekim@mayerbrown.com
                                           tatsuya.koyama@mayerbrown.com


                                           Amanda Streff Bonner
                                           DongWook "Daniel" Kim
                                           MAYER BROWN LLP
                                           71 S. Wacker Drive

79

Chicago, IL 60606
(312) 782-0600
asbonner@mayerbrown.com
dkim@mayerbrown.com

*Counsel for Plaintiff Maxell, Ltd.*